May it please the Court, I'm Norm Watkins and I'm representing the appellant in this matter. This is obviously a very interesting case and we're here on interlocutory appeal from the District Court's denial of a summary judgment motion regarding principally the of a First Amendment claim brought under 42 U.S.C. 1983. The claim arises out of a transfer of a senior deputy district attorney and some others from one post to another within the district attorney's office, fairly characterized. The transfer was an unwanted transfer by the election, one involving contentious intra-office issues, heated accusations against the incumbent district attorney by the plaintiff and others within the office, fairly characterized. It was obviously a rancorous atmosphere leading up to that election. Following the election, Mr. Rackaukas, the elected DA who was returned to office, surveyed the landscape, decided that some changes had to be made to heal the climate within the office, and he, among other things, transferred a number of deputies from the central post in the district attorney's office to the Family Support Division. Counsel, when we are reviewing the denial of qualified immunity, we assess the facts as if the assertions made by the plaintiff were true. And are those assertions consistent with the facts that you're giving us? I think roughly they are. I mean, obviously there are different characterizations that one side or the other might put on the facts, but there's no real disagreement about what happened here. But from what I gathered from the assertions, the plaintiff is saying he was a whistleblower, and that's why he was transferred, not especially because there was an election result. And to me, that's crucial in this case, whether or not we have a political patronage case or whether we have a whistleblower case is crucial, in my view, toward how we analyze this. So how would you characterize this case? Well, I think, Judge Rolison, you've hit right on the issue that strikes me as central to this case. And that is, are we embarking on a new line of decisions that recognize for constitutional purposes, and more importantly for qualified, more importantly to me, for the speech that can be characterized as whistleblowing speech, is a court of different treatment than speech of a political nature, for example. Looking at the legal landscape that this decision, the decision to transfer was made, is a very interesting exercise. We try to do that in I'm unaware of any case as of 2002 or 2003 that suggests, well, with the possible exception of Kaiser, that suggests that Let's talk about Kaiser, because I really need your help in this case. It appears to me that in this circuit we have two opposing lines of cases, Kaiser and Biggs. And what are you proposing that we should do about that? Well, you know, I expected to be asked this morning, because we quoted in our brief a comment by the district judge, and then I interjected in there that I made the same observation as you did, Judge Nelson, that there does appear to be two strains of authority within the Ninth Circuit. Should we go en blanc on this case?  Should we take this case en blanc? Well, I think this is an important case. I think that this case presents an issue that has yet been resolved, certainly by the Supreme Court. It's interesting for me to note that in Garcetti, which just came down, there's no mention of the whistleblower issue when, quite frankly, clearly the speech in that case could be characterized as whistleblower speech. But the court didn't decide that issue, so that leaves us where we were before. Well, that's correct. And the court made no mention of the whistleblower issue. And one could argue, and I certainly would argue, that that's significant, the fact that the court never even looked at that. Is it your point that in today's political climate, where the personal is political, there really is no difference between whistleblowing speech and political speech? Well, I have a hard time drawing a line. And the difficulty that I have is no one would ever argue seriously that exposure of corruption should not be the highest mission of any good public official. But not entitled to First Amendment protection? Of course it's entitled to First Amendment protection under certain circumstances. But the Supreme Court for decades has acknowledged that public officials have limited First Amendment protection. That's just simply. Even when exposing political corruption? So if, for instance, a deputy DA saw the DA taking a bribe and went to the media about that, you're saying that the DA could be fired with impunity? I'm not saying that at all. What I am saying is that when Mr. Rakakis made his. But answer my hypothetical question. So would there be whistleblower protection in that instance? There may be. There may be. There may not be. I need more facts. Does it depend whether the deputy DA is a policymaker or not? Of course it matters. I mean. Is that the determinative issue? Well, it could be. So your argument is, if someone is a policymaker and exposes corruption, that person can be fired with impunity. That's basically what you're arguing. It's an argument that is based upon the Supreme Court of the United States decision and this court's decision in Fazio, which says. Fazio is a political patronage case. And that's why I made the distinction originally, because I understand completely in a political patronage scenario that the the office holder has the right to have people who shares his or her philosophy. That's a whole different situation than when you have someone who's trying to weed out people who are exposing corruption in the organization. The difficulty that that we are having and I'm having is that in the context of qualified immunity. To go down the road of saying if it's whistleblower speech, then it's entitled to super strict scrutiny. Not super strict scrutiny. It's entitled at least to have an opportunity to go to trial. Well, but but the problem is that under the doctrine of qualified immunity, that would be a presumption that there would be no qualified immunity if you characterize the speech as whistleblower. And I'm unaware of any case that has ever suggested such a thing. And Kaiser doesn't suggest that. I don't believe Kaiser does suggest that. Why not? Well, because Kaiser doesn't deal with Brewster and Kaiser doesn't deal with the long line of cases from this circuit. And I've cited them from, I think, the second, the eighth, the sixth, the seventh, the ninth, the third that that make no such dichotomy. Now, the fact of the matter is. That in this case, we don't have a termination, we have a transfer. But it's still an adverse employment decision. It is viewed adversely by the plaintiff, obviously. And we have to accept the plaintiff's facts for purposes of qualified immunity. We have to we have to construe the facts in the light most favorable to the plaintiff. I think I think it's obvious that he didn't like the transfer or we wouldn't be here. Well, as a former district attorney, I can relate to the fact that when you go from being in the courtroom prosecuting felony cases to child support, that's considered an adverse employment. I would think so. I would think so. I try cases all the time and I'm not in trial. I get a little nervous about what I'm doing here. But you don't have a whole bunch of volunteers for that position. That's probably true. That is probably true. And so what we're left with is, is this court prepared to say on the strength of, as far as I can tell, Kaiser and Garcetti, which is what the district court relied upon, and Garcetti I think is probably not available now. Is this court prepared to embark on that line of the Ninth Circuit authority or should it be revisited in light of Garcetti? By the district court, maybe it should be. But the fact of the matter is that under the qualified immunity view, there's no question, I believe, that the district court got one thing right. And that is that the law was at least unclear, at least unclear as to the plaintiff's status as a, quote, policymaker under Elrod Branty. There's no question that there's a long line of cases, and we've cited them all, and I think the plaintiff has cited a number of cases as well, a long line of cases, suggesting, if not holding, that any prosecutor at any level would be considered a policymaker. There's also, it's also. That doesn't definitively decide the question that we have here, though. Just because one is a policymaker doesn't mean that he or she can't be a whistleblower at the same time. Well, I agree with that, but under First Amendment principles, under this course teaching in Best, Best and Krieger and Fazio and the Supreme Court decisions, if the appellant, or the appellee in this case, is a policymaker, then there's no First Amendment analysis that, that's the end of the matter. But the reason why those cases go the way they do is because if you're a policymaker, you're in essence speaking for your organization. And so if you're, if you speak for the organization, you must speak with one voice on those matters regarding the organization. And, and those lines of cases make sense when you're talking about how many cases to prosecute or how the, what the priority of the cases are. They don't make sense when you're talking about someone who's exposing corruption. Again, I guess what we're left with is, frankly, and I think it's in a vacuum, that, that now the suggestion is that it's the nature of the speech and not the nature of the action. It's the nature of the speaker that comes first. And under the, under. I can't believe that you would, in the DA's office, you would think that it should be okay for people to be punished for exposing corruption. That is not, obviously, I don't think that. Mr. Rokakis doesn't think that. The appellee, the appellants don't think that at all. The question is, under the rubric of First Amendment decisions that have come down in this country in the last 50 years, is there any suggestion that if we characterize the speech as whistleblower, that all of the, the Elrod Branty and all of that goes out the window? What you're saying is that on the second step of Saussure versus Katz, it wasn't a clearly established rule. No question, that's exactly what I'm saying, and I'm saying, put yourself in Mr. Rokakis's shoes. He wakes up the day after the election, he looks over the legal landscape, and he says, okay, I've got X number of deputy DA's that wanted to oust me from my position, accuse me of being a criminal, publicly, and, and I, I've determined that this is a rancorous situation that I need to put an end to in my administration. Can I transfer you? Terminate him, why didn't he just terminate him? If he wanted to put an end to it, why didn't he just terminate him? Then he would have been out of the organization, why transfer him? Well, I mean, that's a decision that, that as an executive that he made. I, I, I didn't make the decision, I wasn't consulted, and, and maybe I would have made a different decision, but, but the fact of the matter. Well, you said that he wanted to put an end to it, so if, if the goal was to put an end to it, how would transferring him? Well, he moved them out of the, the central office, and apparently, and, and there's been a number of these cases have been tried, and there's testimony about what was going on in that office, and that's not before this court, it's not in his record. Maybe you don't agree, it was a proposition that whether Mr. Smith was or was not a policymaker, there's some tribal issue of fact as to whether he was or was not. Well, depending on what, when we say tribal issue of fact, is this tribal to a jury? No, this is a, this is a decision I think the court has to make. Now, whether the court wants a, a more record on it, I suppose that's. Well, shouldn't the jury properly instructed, determine whether he had any policymaking functions in his first job, when he was training people as trial attorneys, he wasn't making any decisions to prosecute, he wasn't making any plea negotiations. He wasn't deciding any budgetary conditions. All he was doing was sort of a MCLE professor at the DA's, right? I, I honestly don't, don't believe that that is for a jury. I think under the, under the decisions that have come down that, that the Elrod Branty issue, I've always viewed the, the, the First Amendment analysis as first deal with the Elrod Branty issue, that's legal. Next deal with the Pickering issue, that's legal. If you get beyond all of that, then you go to qualified immunity, that's legal. And if you get beyond all of that, then the question for the jury is, was it retaliatory, and how much are the damages? Counsel, you, in response to Judge Bass's question, you said that the law was not clearly established regarding retaliation for, for speech. Is that what you, what were you saying, it's not clearly established that what? The law was clearly not, was not clearly established with respect to whether or not a deputy district attorney, especially one with 20 years' experience and characterized himself as a senior deputy district attorney, was a policymaker with an Elrod Branty, and that alone. Well, the issue is whether or not it was clearly established that someone could not be adversely impacted in their employment for the exercise of free speech. That's, that's the issue we're looking at. Involving corruption. Right. Well, what we're looking at, we're looking at a claim that a transfer from one post to another violated the First Amendment rights of the plaintiff. In, in response to the bulging corruption. Well. That's the allegation. We have to go with the assertion that's made by the plaintiff. Well, I mean, you know, I mean, I've accepted that for sake of this argument, but. You have to accept it under a qualified immunity analysis. No, but, but I, what I'm saying is that, that there's general agreement about what was said. Now, Mr. Smith denies ever accusing the district attorney of any criminal wrongdoing. That's his testimony. Didn't he go to the attorney general? He, he and two others went to the attorney general, and it was his testimony that he never accused the district attorney of any criminal misconduct. Now, he did accuse him of lacking integrity, and, and, and, and they raised a number of issues. I don't, I'm not privy to what went on with the attorney general, but, but I can just tell you. In the record, it indicates that he went to the attorney general because he had a private foundation, which was immediately eliminated after that meeting with the attorney general, and that questionable decisions were made there. That's all correct. And, and to prosecute, so his friends, just allegations like that were to the attorney general, right? Well, that's, that, that's not as clear, but we do know that the foundation was an issue that was raised with the attorney general. The badges, some of the other things, but the point is, from our perspective, the point is, when this transfer was made, was it clearly established that to do so would violate the First Amendment rights of this plaintiff, this plaintiff being a 20-year deputy district attorney. And when you look over, when, when Mr. Rokakis looks over the legal landscape, as I have said, he sees decisions not only from the second, third, sixth, eighth, seventh circuit, but this circuit that says that if it is a city prosecutor, a city attorney, a prosecutor, a deputy DA, a head deputy DA, all the various characterizations in these cases, he is a, quote, policymaker under L. Rod Branty, and as such, is not entitled to First Amendment protection. That's the decisions. But what you're failing to address is those cases are fine as far as they go, but those are all in the context of political patronage. One person ran against another. They didn't support them in the election. That's a whole different scenario than the whistleblowing context. Those cases don't address whistleblowing at all. Understood. But for purposes of qualified immunity, can we fairly say that in 2002, it was clearly established that whistleblower speech does away with L. Rod Branty? When is, when was Kaiser? Kaiser is, predates, predates this. But Kaiser, Kaiser, Kaiser does not, as I read Kaiser, suggest, doesn't even deal with Fazio, doesn't even cite Fazio. And so the question is, is it clearly established? You know, we go back to Harlow versus Fitzgerald and the standard, and I think we lose sight of this is, as the Supreme Court of the United States said, qualified immunity protects all but the most incompetent. This really has to be clearly established. Does it have to be established by a Supreme Court opinion or can it be established by a Ninth Circuit opinion? Is this an AEDPA case standard? I'm sorry. Is this an anti-terrorist effective death penalty standard? It has to be clearly established by the Supreme Court or can it be clearly established by the Ninth Circuit? No, I don't think it has to be clearly established by the Supreme Court. I think I think it has to be fairly said by by any court reviewing the matter, including this. Reading all of the cases that address the point. I understand. All right, Kelsey, you've exceeded your time. We will give you a minute for rebuttal. I appreciate that. Thank you. Morning, Your Honors. I may have pleased the Court. My name is Jerry Steering. I represent Joseph Smith. He's sitting right back there to my left. In response to some of the questions that Your Honors asked Mr. Watkins, I don't think that there is an inconsistency between Kaiser and the Bestest and Krieger case. Kaiser talks about whistleblowing and retaliation and a long line of Ninth Circuit cases that deal with protected free speech in the context of whistleblowing cases. Bestest and Krieger was a different situation. Bestest and Krieger was a private law firm where the firm, not any particular lawyer in the firm, but the firm itself was contracted out to perform the job of city attorney. And that's not unusual. You have all kinds of cities do that. And a city attorney not only did the persons working for the firm, the lawyers that worked for the city's cases, have a duty to the people and to the public to act as public criminal prosecutors, but they also had a duty to protect the city coffers. They had a duty to the city of Riverside not to make vicarious admissions that could result in civil liability. Their duties, that firm's duties to the city of Redlands, California, is different than the type of duties that a deputy district attorney has to the people of the state of California and to the attorney general's office. I really don't think there's an inconsistency there. Counsel, what's your response to opposing counsel's argument that the law regarding whistleblowers vis-a-vis a district attorney was not clearly established because Kaiser did not address Fazio or the other cases that seem to limit the First Amendment protections for district attorneys? Well, there's two cases that really come to mind. One's Fazio, one's Finkelstein v. Bergen, and I didn't realize this until this morning, but there were two Finkelstein v. Bergen cases, one decided in 89 and one decided in 91. I think the one I cited in my brief was the 91 version, but when I was looking through my papers this morning, I found the 89 version. And Finkelstein was a case where the reigning district attorney was resigning, and he wanted his self-appointed successor to succeed him. And when Finkelstein announced his candidacy against his self-appointed successor, he fired him. And this court said in that case in 89 that there was a, that there is a First Amendment violation. They said in 91 that there is a First Amendment violation, but at the time of the constitutional tort complaint of, which was apparently 1982 because they referenced that year, they say that because the, not just for DAs or prosecutors, but the whole notion of protected free speech for public employees at all was not clearly established as of 1982, which was the time of the, apparently the constitutional violation of Finkelstein, because it wasn't established in 82 that they're going to give Mr. Burton, the DA who fired Mr. Finkelstein, qualified immunity. That case resulted in qualified immunity. And they go on, though, in Finkelstein, and they, and this is page 22 of my brief, in bold and underlined, they say, we cannot conclude in light of pre-existing law that the unlawfulness of Burtonist conduct was clearly established in 1982. And they cite Anderson versus Creighton. And then they say, we hasten to add, however, that we'll reject the proposition that prosecutors have unfettered discretion to discipline assistant prosecutors for exercising their First Amendment rights. Now, that was a 1991 decision. But that says, we don't say that they have unfettered discretion, but we don't say what discretion they don't have. Well, all they're saying is that we cannot conclude in light of what law existed in 82 that it was clear that you could, that retaliation against a public employee for First Amendment exercise was a constitutional violation. But in Fazio, that's exactly what they said, isn't it? As long as the, the, I mean, in Finkelstein, from what you tell me of the case, it would be clearly held now that that was a political position taken by the subordinate. And he, if he was a policymaker, he could be fired. Flat out. Finkelstein, I don't, I just, I'm not sure where the court's coming from, Your Honor. They just, they just say, I think you'd be on better ground answering some of the questions that just, that Judge Rawlinson answered, drawing a distinction between whistleblowing for corruption and getting canned because of political opposition. I understand. But what I'm trying to say is that early as 91, thank you, Your Honor, as early as 91, the Ninth Circuit tells everyone, the world at large, that DAs don't have unfettered discretion to discipline their, their subordinates for exercise of free speech rights. But it doesn't really, that doesn't help you because it's too broad a statement. It doesn't really refine the parameters. I understand. Then we get to, okay, then we get to Fazio. And Fazio was an at-will employee under the charter of the city and county of San Francisco. And they have a, they had a contractual at-will agreement in that county for whatever reason as part of the city charter. And, and in Fazio they said basically because he was an at-will employee that, you know, pursuant to agreement and pursuant to their city charter, that he could be fired for any particular reason. However. Well, didn't, didn't also in Fazio they talk about the distinction between being a policymaker and a non-policymaker? Yes. Isn't that the crux of that case? Yes. But ultimately, ultimately, I mean, you know, it's different courts using different words to describe the same thing. And what they're trying to say, or should be hopefully trying to say, is that it's not whether you're an insider or whether you're a top manager. It's whether or not political loyalty and political affiliation is necessary for the effective performance of that position. Okay. That's what it is. That's what the Supreme Court in all those cases. Was your client a policymaker in your view? No. He was the lowest you can get. And by the time Mr. Akakis was done with him, prior to the transfer to the Family Support Division, which of course became a separate entity, outside of the DA's office four months later per statute on July 1st, 2002, Mr. Smith was doing Prop 36 calendar court. What about when all of this started, when he was the training deputy? No, he was just some person who just did what he was told. No, that's not the test. The test is what was he told to do? Train the new deputy. Isn't that a policymaker? If you're setting, if you're training the people who are going to be deciding what cases to prosecute, how to prosecute, isn't that a policymaker position? Yeah, but that's not what's complained of in the case. That's just the beginning of the story. By the time the constitutional tort came around, by the time the hammer came down, Mr. Smith had already been relegated to Prop 36 duty. Hold on. Let's go for step number one. He's training all the deputies in the office and telling them how to try cases and what a case is worth and what should be charged. Those are all pretty high policy issues. So put that to one side. Then he goes to the target unit and he's prosecuting gang crimes. He's deciding how to allocate resources against certain gangs. Other gangs were pleased to take supervising plea agreements. That's pretty good policy. I agree with you. Prop 36 court is not. But he's been demoted to Prop 36 court from two possible policy positions, hasn't he? Yes. Well, let's put it this way. I don't think they're policy positions, but they're certainly lower. Prop 36 is about, you can't get any lower. It isn't your best position. It's a tribal issue of fact whether it's a policy position. Yes, Your Honor. Do you have any case to support that? That whether or not. Yes. Is the policymaker should go to the jury? Yes. There's a myriad of cases. Decide me one. The best one. Probably Gilbrook or Kaiser. Which one? I was thinking of what, Gilbert versus City of Westminster. I was allowed to go to the jury. On the issue of policymaker. No, I don't believe so. I don't think that issue was ever raised. Kaiser was, though. I'm sure there's cases in there I can. All right. Well, don't waste your time now if you find a better one. The second thing is. Let us know. That the Elrod-Randy exception, general prohibition against retaliation for exercise of First Amendment rights, by this circuit's own cases, does not apply to whistleblower speech. It just doesn't. It doesn't apply to this kind of speech, did you say? Whistleblower speech. Why isn't the charge of corruption these days a political issue? Everything's political, Your Honor. That doesn't really help you, does it? If it's political, then that's what we fall under. Everything in the world's political, to a certain extent. When Mr. Smith went to Sacramento, he didn't say, Mr. Rokakis committed a crime. He said, here's what I'm hearing, here's what's happened, and he felt that it wasn't his place to say whether or not giving badges to your friends that look exactly like police badges, and they're mounted on little notepad folders that fit into your pocket, in exchange for $5,000 donations to the foundation, he's going to let the Attorney General determine whether or not that's a violation of 146B of the Penal Code. Well, but he asserted misuse of the prestige of the office or something. Total, total. And Kaiser was misuse of public funds. Not necessarily a crime, but misuse of public funds. So are you conceding that this was political speech? This was speech where Mr. Smith, on his day off, went to Sacramento to complain about what he thought might be criminal conduct  I don't know if you call that political or not. You might call it political if you want to torpedo somebody's political hopes. You might not call it political if it was just some Deputy District Attorney that wanted to do what he thought was right and report misconduct to the top law enforcement officer. But in the context of the case law that you're dealing with. That's whistleblower speech in the context. The political speech would be campaigning and that kind of thing. So he goes to Sacramento. I guess your answer is you don't concede that. No, I do not. We're talking like it for a moment. Well, I mean to the extent that everything's political. I don't see how that argument helps you counsel. Well, that's more of a philosophical reflection than a legal argument I suppose you're having. This isn't a philosophy course. I understand. Even in Moran v. Washington, which is at 147 F-839, they say that the high-level policymaking official exception, Elrod Branty, doesn't apply to whistleblower speech. And when Mr. Smith goes to Sacramento and says, Mr. Rikakis wants me to give badges out to his friends, the people that the investigators are saying are criminals, or at least one of them, and you can put a nice little badge. It wasn't the size of the DA's badge. It was the size of the police badge in their pockets. And that might be a violation of 146 D or I think it's 538 of the Penal Code. He's going to let the attorney. He's not going to say he committed a crime. He's just going to say, here are the facts. You, Mr. Attorney General, you determine whether or not a crime is committed. And it certainly was enough, from what he told them, to get the whole Orange County Grand Jury going. Just about everybody in the office testified, including Mr. Smith. And, you know, it was basically open season. The day after the election, a letter issues that's in the record. It says, for the good of the office, the following people are hereby transferred to the Family Support Division, for the good of the office. And, you know, it wasn't for the good of the office. It was for the good of Mr. Rikakis. Anybody that opposed him is gone. And, you know, to a certain extent. But that's not necessarily a violation of the First Amendment if everyone who opposed Mr. Rikakis is gone. That's consistent with the political patronage cases. Your Honor, if a deputy DA was walking around on a Saturday afternoon with a campaign badge for Wallace Wade for DA, and Mr. Rikakis saw him, that might be considered political speech, but it wouldn't entitle Mr. Rikakis to fire him. I don't know about that. In the case authority, are you relying upon to say if you can't, if a policymaker campaigns for the opponent of the DA, that the DA can't fire them? I'm not talking about a policymaker. I'm just talking about a rank and file line deputy. And you've got to remember, in Orange County, really the difference is, and they say it in these cases, when Fazio distinguishes Finkelstein, they say, quote, as for our decision on Finkelstein, a key fact in that case differs from the case at hand. Finkelstein's position was a civil service position, while Fazio's position was an at-will position. Was Mr. Smith's position a civil service? He was never an at-will employee. What happened was, when Mr. Rikakis came into the office, he restructured the office. There was a deputy district attorney five, and then assistant district attorney five, assistant district attorney six, and then the chief's assistant, and then the DA. And then below those were the fours, which were the senior attorneys, like Mr. Smith, the threes, the twos, and so forth. There's a memorandum of understanding and a contract whereby, by contract, and by the ordinances and the laws of the County of Orange, their personnel relationships are defined as at-will or not at-will. But that's a different issue. That issue would be resolved administratively, whether or not there was cause to fire, whether or not whatever contract provisions were complied with. That's different than the First Amendment issue. And I'm sure that was all sorted out at a different level than we are. Fazio says that is the issue. It says a key fact in that case differs from the case at hand. Finkelstein's position was a civil service position. Remember, Finkelstein, they didn't say there was a constitutional violation. They just said that it wasn't clearly established in 1982. But they said the key difference is that Finkelstein's position was a civil service position, while Fazio's was an at-will position. And they make that they're saying that's the difference between whether or not you can, you know, demote or fire somebody or get rid of them or not. I don't think that's a winning argument for you. Well, I'm just citing Fazio, the Ninth Circuit, what they say. Anyway, I really got a minute left. I think it just comes down to this. If somebody who is in the position of Mr. Smith can't go to the Attorney General of California or can't go to the press and complain about conduct that could be characterized as a crime, as a professional, as not constituting the best administration of justice, then anybody can. And it's open season on every DA and things. I mean, we had one case last week that put a little damper on things. You know, this case could be the death knell of any effort. Are you talking about Ceballos v. Garcetti? Yes, Your Honor. There, Ceballos, the court strictly held that he had a duty to report to Garcetti. And his report to Garcetti was the basis of Garcetti disciplining him. I understand. So do you think, are you arguing that Ceballos v. Garcetti is determinative in this case? No, because the only issue presented was whether or not something that you just, just doing your job in that manner can be the basis for a constitutional violation. All right. Thank you, Counsel.  One minute for rebuttal, please. Thank you. And I just want to address something that I didn't get a chance to address in my opening argument, and that is that if we get by all of this policymaker, Elrod Branty issue, if we get by that and the court finds that I'm incorrect, then the next analysis is the Pickering analysis. And by this Court's own decision in Brewster, this Court said that if you, if a district court has to engage in the Pickering analysis, rarely, if ever, will qualified immunity not apply. Because that analysis under Pickering is so fact-intensive and so difficult,  that it would be said to clearly be established that what was at issue in that particular, under those circumstances would be clearly established for qualified immunity purposes. So. If we get to Pickering, who determines what the facts are? Judge. The jury or the judge? Judge. Why not the jury? Because, because the cases in this circuit and I believe in the Supreme Court, but certainly in this circuit, we've said it in our brief, say it's a legal determination. Now, the court may want to take evidence, but that's a legal determination that the court has to make. And what this court said in Brewster is that if you get that far, then it's almost inconceivable that you won't have qualified immunity. And I think to tie all this up, at the end of the day, the district court had one thing right, and that was the district court said, and we've quoted it, the law is just unclear. All right. Thank you, counsel. Thank you to both counsels. The case just argued is submitted for decision by the court. The final case on calendar for argument is United States v. Fontaine. And before we hear argument on this case, we'd like to hear counsel's position on the motion. Counsel Proch? There was an ex parte motion that was filed by the appellant, and then I guess subsequently it was served upon the government.   Has the government received a copy of the motion? Do you object? Yes. All right. There being no objection to the motion to seal the proceedings, we're going to ask everyone who's not a law clerk and who's not affiliated with this case to please leave. And I think that's true already. And we're going to ask that there be a sealed record of this hearing. All right. Okay. Counsel, in the future, if you have a number one, if you file a motion, please file it in a more timely fashion to give us an opportunity to deal with it. And please don't file ex parte motions regarding the conducting the proceedings here. That really causes a great deal of difficulty for us when we haven't had an opportunity to hear from opposing counsel regarding a motion. I understand your position was you thought because everything was sealed that this was sort of pro forma. But it makes it much easier for us if we can have the other side to be noticed and weigh in before we rule on it, and we can have everything set. Because it does take a little preparation for us to seal the proceedings. I understand. I apologize, Your Honor. I looked everywhere for a ---- Should we be off? All right. So this won't be seen other than in this courtroom? So just for future reference. Thank you, Your Honor. And the clerk will let us know when we're able to proceed. I looked for a proper motion, you know, on which to pattern my motion and wasn't able to find one, so I just filed a motion. Start a little earlier. Just start looking a little earlier. Thank you, Your Honor. Madam Clerk, if you'll just tell us when it's okay to proceed. I'll take a five-minute break. Yeah, we'll be on recess for five minutes. Thank you.
judges: D.W. Nelson, Rawlinson, Bea